SUNSET BEACH AMUSEMENT CORPORATION, A CORPO-
RATION OF THE STATE OF NEW JERSEY, AND
OLYMPIA AMUSEMENT CORPORATION, A CORPORA-
TION OF THE STATE OF NEW JERSEY, PLAINTIFFS-
APPELLANTS AND CROSS-RESPONDENTS, v. MARVIN
L. BELK, JOSEPH VARBALOW AND JOSEPH VARBA-
LOW REALTY COMPANY, A CORPORATION OF THE
STATE OF NEW JERSEY, DEFENDANTS-RESPOND-
ENTS AND CROSS-APPELLANTS, AND WEST JERSEY
TITLE AND GUARANTY COMPANY, A CORPORATION
OF THE STATE OF NEW JERSEY, DEFENDANT-RE-
SPONDENT.

Argued December 8, 1959—Decided February 8, 1960.

446

*Mr. W. Louis Bossle* argued the cause for plaintiffs-appellants and cross-respondents (*Mr. Blaine E. Capehart,* attorney; *Mr. W. Louis Bossle,* of counsel).

*Mr. Louis B. LeDuc* argued the cause for defendants-respondents and cross-appellants.

The opinion of the court was delivered by

WEINTRAUB, C. J.    Plaintiffs sued for specific performance of a contract for the sale of their amusement park. The trial court found for them and against the buyer, Marvin L. Belk, and his corporate nominee, Joseph Varbalow Realty Company.    Their victory, plaintiffs urge, was hollow, since the judgment runs against defendants who presumably cannot pay and fails to reach moneys escrowed for the payment of the purchase price.   The trial court determined those moneys belonged to defendant Joseph Varbalow individually and had not been finally committed in the transaction.    Plaintiffs seek a reversal of the judgment for Varbalow.    Defendants cross-appeal, contending that under the contract plaintiffs were required to accept the initial deposit in lieu of any right to enforce the contract.

Varbalow sought to acquire the amusement park for his son, a sophomore in college, and for his son-in-law, Belk, then unemployed.   He planned to furnish the necessary funds. On June 30, 1958 a contract of sale was executed with Belk as buyer.    The agreed price was $250,000, with an initial deposit of $25,000 to be held by West Jersey Title and Guaranty Company, the balance to be paid at final settlement.

By its terms the buyer was entitled to take possession on July 1 and he did.

On August 15 the parties met at the title company to close the transaction. All adjustments were agreed upon and the usual statement of settlement was signed by the sellers and by Varbalow as attorney for the buyer. The deed to the nominee was placed with the title company. Treasurer's checks for the balance of $225,000 were already in its hands. Several matters remained to be cleaned up and they were noted as follows at the foot of the settlement statement:

"The undersigned parties agree that completion of this settlement shall be conditional upon the removal of Exceptions Nos. 2 from the Report of Title by the persons properly responsible therefor & new Agreement as to restraint of trade to be signed by M. D. Borrelli. Delay in completion of settlement will require adjustment of interest charges to date of distribution. Title Policy to be issued subject to Exceptions Nos. 4 as to last ¼ 1958 tax—6—9—10—11—12—13—16—as shown on said report. Also lease signed Vincent Borrelli et ux shows no interest in land known as lot No. 32 Lakeview Heights."

None of the matters so reserved was expected to present a problem. One, however, resulted in some delay. Exception No. 2 in the report of title read:

"2. Any variation in location of lines, or dimensions or any state of facts which an accurate survey approved by this Company would disclose, or which are visible, or are known to the Insured."

The buyer had not obtained a survey prior to the date of settlement, and when thereafter he did, encroachments upon public streets were revealed. Apparently they were "paper" streets. At any rate, the difficulty was resolved expeditiously and prior to the trial of this matter, the streets being vacated by the municipality. *Schultz v. Pollock,* 102 *N. J. Eq.* 157 (*Ch.* 1928), affirmed on opinion below 104 *N. J. Eq.* 205 (*E. & A.* 1929); *Paradiso v. Mazejy,* 3 *N. J.* 110 (1949). Belk was notified promptly and he relayed the information to Varbalow. Time was not of the essence, and it is clear

that plaintiffs were in a position to perform fully on November 10, the date the streets were vacated. The title company undoubtedly would have transmitted the deed and disbursed the funds, *Cooper v. Bergton,* 18 *N. J. Super.* 272, 277 (*App. Div.* 1952), but for the circumstance that Varbalow had failed to release a hold he claimed upon the treasurer's checks.

The complaint was filed on October 8, 1958, in advance of the vacation of the streets. Plaintiffs correctly apprehended that a suit would be necessary. They had learned that Varbalow had not endorsed the treasurer's checks. Moreover, shortly after the settlement meeting of August 15, Varbalow asserted the physical condition of the structures had been misrepresented and pressed for an abatement of $25,000 in the purchase price. There was no basis for Varbalow's demand. The trial court so found, and its finding is not questioned before us. Despite the institution of suit, Belk and his corporate nominee continued to operate the park. On December 29, 1958 they tendered a return of possession, which plaintiffs refused. Defendants continued in possession—they say to protect the subject matter —until February 2, 1959, when upon plaintiffs' application a custodial receiver was appointed to continue the operation *pendente lite.*

## I.

It is more convenient to start with the cross-appeal.

It revolves about paragraph 15 of the contract which reads:

"If the sellers are in a position to, and actually can tender a deed or deeds, and a bill of sale or bills of sale, and discharge all of the obligations undertaken by the sellers in this agreement and, in the event of the buyer not making final settlement in accordance with the terms of this agreement, the payment or payments made on account, sellers shall keep the deposit as liquidated damages for failure of the buyer to settle without further liability on the part of the buyer to make settlement, or without any further right on the part of the seller to institute any suit either in a law court for damages, or in a Superior Court, Chancery Division, for specific performance against the buyer."

█ The parties agree that under this provision the buyer could elect either to perform or to pay the deposit of $25,000 as liquidated damages. See *Cohen v. Cohn,* 102 *N. J. Eq.* 245 (*E. & A.* 1928); *In re Talnall,* 102 *N. J. Eq.* 445 (*Ch.* 1928), affirmed on opinion below 104 *N. J. Eq.* 486 (*E. & A.* 1929); *Porter v. Williams,* 93 *N. J. Eq.* 88 (*Ch.* 1921), affirmed on opinion below 93 *N. J. Eq.* 505 (*E. & A.* 1922); *Hamilton v. Memorial Hospital,* 16 *N. J. Super.* 405 (*Ch. Div.* 1951); *Nolan v. Kirchner,* 98 *N. J. Eq.* 452 (*Ch.* 1925). Defendants insist the buyer could choose to lose the deposit at any time up to the actual transmittal of the deed and purchase moneys by the title company to the respective parties despite the buyer's initial decision to perform and the settlement meeting held for that purpose. The sellers, on the other hand, maintain that the buyer had to elect between performance and payment and that an election to perform was final. See *Restatement of Contracts* (1932), § 325 (2); 5 *Corbin on Contracts* (1951), § 1079, *p.* 382; *Brown v. Norcross,* 59 *N. J. Eq.* 427, 432 (*Ch.* 1900). Further, sellers urge, the buyer did in fact make final settlement within the fair meaning of the phrase "in the event of the buyer not making final settlement in accordance with the terms of this agreement," and hence the die was cast upon the most generous view of the covenant that may be accorded the buyer. With this we agree, and hence we need not consider whether an election to perform would without more have barred a later decision to pay damages. We are satisfied the trial court properly found for plaintiffs and ordered completion of the settlement.

█ The meeting of August 15 was a rather typical final closing. The executory contract of sale was consummated subject to some loose ends which the parties conceived to be too minor to warrant postponement of the event. What remained to be done or cleared related to the sellers' performance and not to the buyer's, and the sellers disposed of the stipulated items prior to the buyer's attempt to reverse the election to perform. As defendants themselves stated in

their pretrial memorandum, "The parties endorsed on the settlement sheet their mutual agreement to consummate on condition, among others, that plaintiffs would remove title exception No. 2 requiring a survey disclosing lines and physical conditions, the buyer on its part waiving certain other exceptions raised by the Title Company." The contract of sale was thus superseded *pro tanto* by the agreement for the deposit in escrow of the deed and the moneys. Neither the seller nor the buyer could unilaterally rescind the arrangement, *Mecray v. Goldman,* 102 *N. J. Eq.* 559 (*Ch.* 1928), affirmed on opinion below 105 *N. J. Eq.* 583 (*E. & A.* 1929); *Cooper v. Bergton, supra* (18 *N. J. Super.* 272), in the absence of an express stipulation permitting it. The settlement agreement contained no option to pay damages, and for the obvious reason that none was intended.

A brief resume shows the parties considered a final settlement to have been made on August 15.

■ Belk exercised his right to designate a nominee (the corporate defendant) pursuant to paragraph 4 of the contract of sale, which reads:

"Buyer reserves the right at time of final settlement to accept title or designate what person or corporation shall accept title in his place, in which event the sellers hereby agree to convey to such nominee of buyer, with title company approval."

The deed and bills of sale accordingly ran to the nominee. Defendants curiously urge a "novation" thereby occurred, substituting the obligation of the nominee for the obligation of Belk. Of course the contract envisioned no such thing. On the contrary, it contemplated the advent of the nominee as an incident of the final settlement itself upon the thesis that the purchase price would simultaneously be paid or placed within the sellers' reach, and hence the designation of a nominee and the approval of the closing documents running to the nominee are evidence of the occurrence of the settlement.

At the closing, defendants succeeded in obtaining adjustments on two items: (1) one-half of the rent from a

bungalow and (2) a stamp tax on the operation of the bowling alleys. As to both items, the sellers delivered checks dated August 20 and 22, payable to the nominee corporation, both of which were promptly deposited in the latter's account, upon an endorsement for it by Varbalow as attorney. The delivery and acceptance of these checks indicate an understanding that the deal had been closed. On August 18 Varbalow sent three documents to the attorney for sellers for execution and return to him. They included an agreement against further competition by M. D. Borrelli, the principal stockholder of plaintiff corporations, and an "option" in favor of Varbalow personally to purchase for $22,000 a mortgage in the principal sum of $31,500 held by Mr. Borrelli upon adjacent property. These documents were executed, delivered to, and accepted by Varbalow after August 15. The option to buy the mortgage was sought by Varbalow to protect the investment in the amusement park. None of the parties intended the option to go other than as an incident to the consummation of the basic sale.

Also executed and delivered to the buyer were transfers of the equity in the bowling alleys and pinsetting equipment. On August 21 Varbalow sent the bill of sale to the conditional vendor requesting the making of "proper notations in your records," and adding that "our company has assumed the obligations and shall continue to pay the installments as per the original conditional bill of sale." Varbalow then corresponded with the conditional vendor with respect to terms upon which the balance could be refinanced, his last letter being dated December 30, a day after possession was sought to be returned to the sellers.

In addition, Belk, under the active guidance of Varbalow, made sundry physical changes and sales of equipment which in sum total transcended the control vested in Belk as buyer in possession under the contract provision that "Buyer shall have full power to hire and/or discharge any and all employees and also make purchases or advertise the premises in any manner that he may desire." On December 19

Varbalow transmitted instructions to Belk relating to the installation of a pony track and a miniature golf course, adding "These two things must be done !" and further that "I am going to put down a schedule of events and we will simply have to get everything done. We are getting nowhere fast, because there is no direction and no coordination." As late as January or February, the buyer installed a sound system.

Thus the record cogently demonstrates that a final settlement within the meaning of the contract was had on August 15 and that thereafter the actors proceeded on the premise that the transaction was concluded, subject only to the items mentioned at the foot of the settlement statement, all of which were disposed of.

## II.

Varbalow maintained successfully in the trial court that he individually owned and retained control of the sum of $225,000 posted with the title company. The precise basis for the court's finding was not articulated beyond a statement that the deposit "was made by Joseph Varbalow as the apparent intended mortgagee." We think the record compels a finding that the moneys were firmly committed and that plaintiffs are entitled to have them applied to the judgment for specific performance.

The issue, a factual one, does not turn upon a nice appraisal of demeanor of witnesses as to which a trial court is in a position superior to ours. Rather the undisputed events and documents are unequivocal and dictate the result we reach.

The contract called for a cash deal. The buyer was required at time of final settlement to pay the balance of $225,000 by cashier's checks drawn on specified banks. Paragraph 3 contemplated that the title company would disburse the unpaid balance "after said title company has completed the necessary continuation search to cover the record" of the

deed. On July 30 Varbalow sent the title company two checks meeting the contract description. In his letter of transmittal, he stated:

"These checks are delivered on the express condition that they will be used at the time of settlement and conveyance of the properties, pursuant to the agreement entered into between the Sunset Beach Amusement Corporation, the Olympia Amusement Corporation and Marvin L. Belk. The checks cannot be disbursed without my consent and, upon my request, may be returned to me."

One check, for $200,000, was payable to the title company and bore the following on the reverse side:

"Pay to the order of West Jersey Title and Guaranty Company pursuant to Settlement Certificate 191-847 when approved by Joseph Varbalow who has the right to a return of this check if settlement is not made."

The other check, for $25,000, was payable to the order of Varbalow and had the following endorsement, without, however, Varbalow's signature:

"Pay to the order of West Jersey Title and Guaranty Company to make settlement on property described in App. 191-847 when approved by the undersigned, who has the right to the return of this check if settlement is not made."

Varbalow contended at the trial that he planned to take a mortgage to secure his advance. Undoubtedly so, but that was no concern of the sellers. They were entitled to cash and had every right to believe the checks represented funds furnished by Belk or his nominee, Joseph Varbalow Realty Company, no matter what arrangements he or it may have made to obtain them. Indeed the amended answer filed by defendants on January 19, 1959 stated:

"Answering paragraph 7, it is admitted that on or before July 1, 1958 cashier's checks in the amount of $225,000.00 *were produced by Joseph Varbalow Realty Company and left with the said Title Company so that said defendant* would be in position to complete the executory obligations imposed on the buyer by the said agreement

of sale.  After it became evident that the plaintiffs could not carry out their obligations under said agreement and were unwilling to allow appropriate   abatement of the purchase price, *the said corporate defendant requested the return of said* $225,000.00 by the defendant, West Jersey Title and Guaranty Company, which has refused to honor said request." (Emphasis added.)

The statement of settlement signed by Varbalow as attorney for the buyer shows "Credit for checks on deposit $225,000" and "Balance due by purchaser—Received by W. J. T. and G. Co." followed by reference to three checks, the two mentioned above, and a third for $775, representing an additional sum payable after adjustments.

Varbalow claims he acted in many capacities. He had designed the transaction for the benefit of his son and son-in-law.  He claimed 50 percent of the commission as co-broker and the statement of settlement called for a disbursement of $6,250 to him. He acted as attorney for the buyer. He also was the dominant figure in the operation of the park, fixing its policies and directing specific action, in which connection he drew $100 per week from the receipts. He seeks to avoid the plain meaning of his acts by asserting an undisclosed intention to retain control of the moneys in his individual interest as a potential mortgagee.

If Varbalow truly intended the reservation he now urges, he had ample opportunity to proclaim it. He could have done so explicitly when he deposited the checks with the title company.  At the final settlement meeting, the representative of the title company reminded him to endorse the checks before leaving. He did not dissent; rather, he just left without doing it. We find no testimony by him with respect to this significant incident. Nor did he testify that he in fact had any mental reservation. His reliance seems to be placed wholly upon the letter of transmittal and the endorsements upon the checks, all of which is completely consistent with the thesis that he then acted solely for the buyer.  Indeed if we accepted his claim that the endorsements and letter of transmittal to the title company pre-

served in him individually a hold upon the moneys, he relinquished it when he signed the settlement statement under which they were applied to the purchase price. It is quite remarkable for one to disavow what he did as an agent by asserting that he silently retained a personal interest which nullified his representative action. As we have said, Varbalow did not advance that position in his testimony. On the contrary, he acknowledged upon direct examination that the moneys were to be distributed when the open items noted on the settlement statement were eliminated, his testimony reading:

"Q. Now, how did the meeting on August 15th terminate? A. It terminated just as the settlement sheet—or, on the form of the Title Company, what they call the settlement sheet—showed, that there was to be no distribution of any moneys until Exception Two was to be removed by the grantors, or the people—that is, Mr. Borrelli and his corporations, and Mr. Dawson, as the attorney for Mr. Borrelli, was instructed to cooperate, and to bring about a removal.

Q. Removal of what? A. Mr. Borrelli advised Mr. Dawson to take every step to bring about a removal of the Exception Two."

Varbalow has been a member of the bar of this State for 40 years. He was seasoned in real estate matters as both an attorney and principal in numerous transactions, many with the title company engaged in this matter. He fully understood final settlements and escrow arrangements. In the light of his training and experience it is difficult to comprehend the fine line he seeks to draw. He had to know the sellers and their attorney left the meeting of August 15 with the warranted understanding that the matter was concluded subject only to the reserved matters described above. We have no doubt that Varbalow's understanding coincided perfectly with theirs. No other thesis can explain his acceptance and deposit of the adjustment checks, his acceptance of the assignment of the equity in the bowling alleys and his negotiations with the conditional vendor, the acceptance of the agreement against competition and of the option in

himself to buy the mortgage on the adjacent property at a substantial discount, the alterations of the premises, the sale of equipment and the efforts to introduce new attractions.

The funds were committed by the unambiguous behavior of Varbalow. He posted the moneys on behalf of the purchaser and the nominee and the moneys became theirs. They could not be withdrawn in violation of the contract of sale and the settlement agreement. Plaintiffs are entitled to judgment directing application of the moneys to the buyer's obligation to perform the judgment for specific performance. 19 *Am. Jur., Escrow,* § 31, *p.* 452.

### · III.

Lastly defendants urge that specific performance should be denied because of alleged misconduct by the sellers and hardship consequent upon changed circumstances, including the appointment of the custodial receiver. We find no misconduct on their part. And if there be a hardship, it is of defendants' making. It should remain with them.

The judgment in favor of plaintiffs against Belk and the corporate defendant is affirmed. The judgment in favor of Varbalow is reversed with directions to enter judgment in harmony with this opinion.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR and SCHETTINO—6.

*Opposed*—None.